**INTERNATIONAL SHIP REPAIR AND MARINE SERVICES, INC., Plaintiff,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.**

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff,**

v.

**INTERNATIONAL SHIP REPAIR AND MARINE SERVICES, INC., et al., Defendants.**

Nos. 94–1368–CIV–T–17, 94–1844–CIV–T–17.

United States District Court, M.D. Florida, Tampa Division.

Nov. 6, 1996.

G. Calvin Hayes, Paul E. Parrish, Holland & Knight, Tampa, FL, and U. Charles Remmel, R. Terrance Duddy, Leland N. Chisholm, Kelly, Remmel & Zimmerman, Portland, ME, for International Ship Repair & Marine Services, Inc.

Timothy Peter Shusta, Hayden & Milliken, P.A., Tampa, FL, John A.V. Nicoletti, Donovan, Parry, Walsh & Repetto, New York City, Seth S. Holbrook, Law Office of Seth S. Holbrook, Melrose, MA, for St. Paul Fire and Marine Insurance Company.

Allen K. Von Spiegelfeld, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, FL, for Dann Ocean Towing.

## ORDER ON PLAINTIFF INTERNATIONAL SHIP'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND TO AMEND COMPLAINT FOR PUNITIVE DAMAGES

KOVACHEVICH, Chief Judge.

This cause comes before the Court on the following motions, responses, and proffer of evidence:

1. Plaintiff International Ship Repair and Marine Services, Inc.'s ("International Ship") motion for partial summary judgment on Defendant St. Paul Fire and Marine Insurance Company's ("St. Paul") affirmative defenses and supporting memorandum of law, filed June 10, 1996. (Docket No. 132)

2. St. Paul's memorandum of law in opposition to International Ship's motion for partial summary judgment, filed July 10, 1996. (Docket No. 138)

3. International Ship's motion to amend its complaint to state claims for punitive damages and memorandum of law in support, filed June 28, 1996. (Docket No. 137)

4. International Ship's proffer of evidence in support of its motion to amend its complaint to state claims for punitive damages, filed June 7, 1996. (Docket No. 130)

5. St. Paul's memorandum of law in opposition to International Ship's motion to amend complaint, filed July 30, 1996. (Docket No. 147)

## FACTUAL BACKGROUND

With over eight (8) volumes of court files, this case, needless to say, has an extensive factual and procedural history. Although the background of this case has been well articulated by this Court in *Int'l Ship Repair & Marine Serv., Inc. v. St. Paul Fire & Marine Ins. Co.*, 906 F.Supp. 645, 646–47 (M.D.Fla. 1995), and *Int'l Ship Repair & Marine Serv., Inc. v. St. Paul Fire & Marine Ins. Co.*, 922 F.Supp. 577, 578 (M.D.Fla.1996), it is necessary to restate the following facts which are relevant to the issues before the Court.

This cause of action originated from an insurance policy, Form 107 (the "policy"), issued by St. Paul to International Ship. The policy covered International Ship's floating dry dock (the "CHL2") on its voyage between Portland, Maine, and Tampa, Florida. In extending insurance to the CHL2, St. Paul simply added a rider to International Ship's existing insurance policy with St. Paul, without amending it in any way. On October 29, 1993, the CHL2 suffered a casualty during its voyage causing it to divert to Boston where it was drydocked for repairs. From this casualty, International Ship filed an insurance claim with St. Paul in November 1993. After surveying the damage to CHL2, St. Paul denied coverage on August 4, 1994.

Thereafter, on August 8, 1996, St. Paul provided the following notification:

> Further to our conversation this morning, we [St. Paul] have reconsidered our position on the ... CHL2 and regretfully must confirm insurance will be on a total loss only basis. Our position is based on a report prepared for us by R. Sambrook of The Salvage Association. (copy follows). Please advise ... [International Ship] that because the ... [CHL2] was unseaworthy at inception of the policy, **the previous insurance was void.** Consequently, we are now extending new terms for the upcoming transit....

(Docket No. 130, Exhibit 6) Despite this notification, International Ship considered its policy still in force. (Docket No. 132) Nonetheless, St. Paul offered new coverage under the policy which International Ship accepted, even though International Ship considered the coverage "very limited in nature." (Docket Nos. 130, 147) This new coverage was on a total loss basis.

Unfortunately, the CHL2 sank on its remaining voyage to Tampa after being repaired in Boston. International Ship again filed a claim with St. Paul for the $1.1 million face value of the policy. St. Paul rejected this second claim on the grounds that the policy was null and void because of the CHL2's alleged unseaworthiness. St. Paul contends that it was the CHL2's unseaworthiness due to wear and tear that was the "proximate cause of the first claim, lost hull planking, and/or the second claim, the ultimate sinking of the CHL2." (Docket No. 138)

## MOTIONS FOR PARTIAL SUMMARY JUDGMENT REGARDING ST. PAUL'S AFFIRMATIVE DEFENSES

International Ship first moves for a partial summary judgment as a matter of law on St. Paul's second, third, and fifth affirmative defenses (the "defenses"). St. Paul's defenses are as follows:

> (2) There is no coverage for the subject loss in that the subject policy was null and void *ab initio* and the converge [sic] was no longer in effect for any further towing of the subject dry dock [i.e. CHL2] as of August 4, 1994.

> (3) That at the time of the sinking on August 14, 1994, the subject drydock was no longer insured by ST. PAUL. [St. Paul alleges that, in conjunction with declining International Ship's first claim, that the coverage under the endorsement adding the CHL2 to the hull policy was null and void *ab initio* and the coverage was no longer in effect for any further towing of the CHL2 to Tampa.]

(5) There is no coverage for the subject loss in that ISR [i.e. International Ship] has breached the warranty of seaworthiness at the time it made application for, and ST. PAUL bound, the relevant endorsement to the hull policy and therefore the coverage is void *ab initio* and ST. PAUL is not liable for any claim under this endorsement to the hull policy. In particular, ST. PAUL warranted the seaworthiness of the drydock a [sic] the time of making application to ST. PAUL for the relevant endorsement to the hull policy. At the time application was made and at the time the coverage was bound by ST. PAUL, the drydock was unseaworthy.

(Docket No. 52)

International Ship argues that these defenses should be stricken because the policy remained in force throughout the CHL2's voyage from Maine to Tampa and was not, as a matter of law, void *ab initio*. International Ship's argument is based on the following: (1) the policy covering the CHL2 is an "all risk" policy providing all inclusive coverage, including breaches of warranty, (2) the policy contains an "Inchmaree clause" which covers negligence by the master and latent defects, and (3) the "held covered" clause contained in the policy insured any breach of warranty or deviation from the conditions of the policy, including the implied warranty of seaworthiness at the inception of the policy.[1] (Docket No. 132)

In contrast, St. Paul argues that the policy did not provide coverage for losses resulting from unseaworthiness due to wear and tear, wastage and/or deterioration. Further, the policy's "held covered" clause does not apply to the "absolute" implied warranty of seaworthiness nor to intentional breaches of warranty. Based on this argument, St. Paul avers that even if the held covered clause does cover the implied warranty of seaworthiness, International Ship will be unable to recover based on "its failure to give immediate notice of breach and immediately agree to additional premium commensurate with the additional risk...." (Docket No. 138)

**1.** International Ship also argues that the policy's "seaworthiness admitted" clause waived the implied warranty of seaworthiness on the CHL2.

### Standard of Review For Partial Summary Judgment

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the non-moving party. *First Texas Sav. Ass'n v. Comprop Inv. Properties Ltd.*, 752 F.Supp. 1568, 1570 (M.D.Fla.1990). *See Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First Nat'l Bank of Mt. Pleasant, Tex.*, 595 F.2d 994, 996–97 (5th Cir.1979). Factual disputes preclude summary judgment. Accordingly, International Ship has admitted, for the purposes of its motion, that the CHL2 was "unseaworthy when [International Ship] ... applied for insurance and [that International Ship] ... breached the implied warranty of seaworthiness." (Docket No. 132)

The United States Supreme Court held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986), that:

In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

The *Celotex* Court also stated that "Rule 56(e) ... requires the non-moving party to go beyond the pleadings and by [its] ... own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

Furthermore, as this Court has previously stated in *Int'l Ship & Marine Serv.*, 906 F.Supp. at 650, the moving party has the initial burden of identifying the evidence (Docket No. 132) However, this Court has previously rejected this argument in *Int'l Ship & Marine Serv.*, 906 F.Supp. at 651.

which it believes shows the absence of a genuine issue of material fact. *United States v. Four Parcels of Real Property In Greene & Tuscaloosa Counties In the State of Ala.,* 941 F.2d 1428, 1438 (11th Cir.1991). "To do so, the moving party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." *Int'l Ship & Marine Serv.,* 906 F.Supp. at 650 (citing *Celotex,* 477 U.S. at 331, 106 S.Ct. at 2557 (Brennan, J., dissenting)).

Once the moving party satisfies its burden, it is up to the nonmoving party to show that a genuine issue of material fact remains. However, if the moving party does not satisfy its burden, the nonmoving party is not required to make this showing and the motion for summary judgment will be denied. *Id.* See *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991).

■ In this case, partial summary judgment may be used by the Court to dispose of affirmative defenses. The effect being that if the moving party sustains its burden, then the affirmative defenses will be struck by the Court.

### Interpretation of Insurance Policies

■ Under Florida law, which we must apply in this case, a number of general rules govern the interpretation of an insurance policy. First and foremost, the interpretation of the provisions of an insurance contract is a matter of law to be decided by the court. *Adelberg v. Berkshire Life Ins. Co.,* 97 F.3d 470, 472 (11th Cir.1996); *Gas Kwick, Inc. v. United Pac. Ins. Co.,* 58 F.3d 1536, 1538–39 (11th Cir.1995). Therefore, in this case, construction of the policy may be a question of law and suitable for summary judgment. *Central Nat'l Bank v. Palmer,* 806 F.Supp. 253, 256 (M.D.Fla.1992).

■ Secondly, in order to properly interpret an insurance policy, a court must construe the "entire policy." *City of Delray Beach v. Agric. Ins. Co.,* 936 F.Supp. 931, 936 (S.D.Fla.1994), *aff'd,* 85 F.3d 1527 (11th Cir. 1996). In *Int'l Ins. Co. v. Johns,* 874 F.2d 1447, 1456 (11th Cir.1989), the court stated that "[i]n Florida, a court must construe every insurance contract according to the

entirety of its terms and conditions. A court should construe each sentence in connection with other provisions of the policy to arrive at a reasonable construction that accomplishes the intended purpose of the parties." Thus, the Court will now address each argument raised by International Ship along with the entire policy which International Ship relies upon.

### International Ship's "All Risk" Argument

■ International Ship contends that the policy is an "all risk" policy providing all inclusive coverage. The clause of the policy which International Ship relies upon is as follows:

> TOUCHING THE ADVENTURES AND **PERILS** which we, the said Assures, are contented to bear and take upon us, they are of the Seas, Rivers, Lakes, Harbours, Men-of-War, Fire Enemies, Pirates, Thieves, Jettisons, Letters of Mart or Counter Mart, Surprisals, Takings at Sea, Arrests, Restraints, Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners, Explosions, Riots, **or other causes of whatsoever nature arising either on shore or otherwise, causing Loss of or injury to the Property hereby insured, and of all other Perils, Losses, and Misfortunes** that have or shall come to the Hurt, Detriment, or Damage of the said Dock, & c., or any part thereof....

(Docket No. 130, Exhibit 2)

Even though the clause contains some language which is similar to a "perils" provision, International Ships argues that the policy insures not only perils but covers damage for "other causes of whatsoever nature arising either on shore or otherwise." (Docket No. 132) However, St. Paul contests this argument, contending that the policy was in fact a covered perils provision.

■ An all risk policy is one which provides coverage against all risks, the words typically being inserted in writing, covering every loss that may happen except by the fraudulent acts of the insured. *Morrison Grain Co. v. Utica Mutual Ins. Co.,* 446

F.Supp. 415, 420 (M.D.Fla.1977), *aff'd in part, remanded in part,* 632 F.2d 424 (5th Cir.1980). Accordingly, "an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Dow Chemical Co. v. Royal Indem. Co.,* 635 F.2d 379, 386 (5th Cir.1981) (citing, among others, *Morrison Grain,* 632 F.2d at 424).

In support of their policy arguments, both International Ship and St. Paul cite *Mellon v. Fed. Ins. Co.,* 14 F.2d 997 (S.D.N.Y.1926). In *Mellon,* the court interpreted the following provisions of a marine insurance policy:

Touching the adventures and perils which we, the said assurers, are contented to bear and take upon us, they are of the seas, men of war, fire, enemies, pirates, rovers, thieves, jettisons, letters of mart and counter mart, surprisals, takings at sea, arrests, restraints and detainments of all kings, princes and peoples, of what nation, condition or quality soever, barratry of the master and mariners, explosions, riots, **or other causes of whatsoever nature arising, either on shore or otherwise, causing injury to the property hereby insured and of all other perils, losses, and misfortunes** that have or shall come to the hurt, detriment, or damage of the said ship, etc., or any part thereof. *Id.* at 998. The *Mellon* court held that the inclusion of the phrase "other causes of whatsoever nature" covers "all risks" and, thus, "[t]he perils clause is an all risk clause...." *Id.* at 1001.

This Court is in agreement with the *Mellon* court and all other decisions which interpret similar insurance provisions in the same manner. Any time an insurer decides to draft an insurance policy which provides coverage for "other causes of whatsoever nature" and "all other perils, losses, and misfortunes," it intends to provide "all risk" coverage to its insured, not simply a covered "perils" policy.

■ An all risk policy, such as the one involved here, benefits the insured in that the policy covers any loss without putting upon the insured the burden of proving that the loss was due to a peril falling within the policy's coverage. *Morrison Grain,* 446 F.Supp. at 420. Thus, in order to recover under an all risk policy, an insured must prove only the loss or damage to the insured's property while the policy was in force, with the burden then shifting to the insurer to prove that the loss arose from a cause that is excluded under the policy. *Nat'l Union Fire Ins. Co. of Pa. v. Carib Aviation, Inc.,* 759 F.2d 873, 875 (11th Cir. 1985).

■ In addition, St. Paul argues that even if the policy was an "all risk" policy, International Ship would still have the burden of proving that it suffered a "fortuitous" loss. The Court agrees. In an action under an all risks policy, the insured has typically been required to show that the loss or damage was fortuitous. *Morrison Grain,* 632 F.2d at 431. *See Texas E. Transmission v. Marine Office–Appleton & Cox Corp.,* 579 F.2d 561, 564 (10th Cir.1978) ("[R]ecovery under ... [an all risks] policy will generally be allowed, **at least for all losses of a fortuitous nature,** in the absence of fraud or other intentional misconduct of the insured.... No case has been found denying the above proposition"). *See also Phoenix Ins. Co. v. Branch,* 234 So.2d 396, 398 (Fla. 4th DCA 1970) ("[A]lthough the insured seeking to recover under an 'all risks' policy has the burden of proving that the insured property was lost or damaged **and possibly that the loss was fortuitous,** the rule is that once the insured establishes a loss apparently within the terms of the policy, the burden is upon the insurer to provide that the loss arose from a cause which is excepted").

The Restatement of Contracts, Section 291, comment a (1932), defines a fortuitous event as:

an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, such as the loss of a vessel, provided that the fact is unknown to the parties.

In contrast, "[a] loss is not considered fortuitous if it results from an inherent defect in

the object damaged, from ordinary wear and tear, or from the intentional misconduct of the insured. However, loss due to the negligence of the insured or his agents has generally been held to be fortuitous and, absent express exclusion, is covered by an all risks policy." *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir.1979). *See Sipowicz v. Wimble*, 370 F.Supp. 442, 446 (S.D.N.Y.1974) ("[F]ortuitous events are accidents or casualties of the seas, unforeseen and unexpected events, and [are not] ... losses occasioned by the incursion of water into a vessel's hull owing to the defective, deteriorated or decayed condition of the hull or ordinary wear and tear").

In any case, the burden of demonstrating a fortuitous event is not an onerous one. More importantly, courts which have considered the question have rejected the notion that the insured must show the precise cause of loss to demonstrate fortuity. *Morrison Grain*, 632 F.2d at 431. *See Texas E. Transmission*, 579 F.2d at 564.

■ International Ship has provide no argument nor brought forth any evidence that would sustain its burden of showing that the sinking of the CHL2 was fortuitous and that *no genuine issue of material fact*. Therefore, International Ship has failed to meet its burden under its "all risk" argument and summary judgment will be denied as to this argument notwithstanding that St. Paul has introduced no evidence on the issue of fortuity. *See Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir.1967) ("The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever").

### International Ship's "Inchmaree" Argument

■ In addition to International Ship's "all risk" argument, it argues that the policy contains an "Inchmaree" clause, a provision designed to expand protection to shipowners. The relevant portion of the policy is set forth below:

THIS INSURANCE ALSO SPECIALLY TO COVER LOSS OF, OR DAMAGE TO HULL OR MACHINERY, THROUGH THE NEGLIGENCE OF Masters, Charters, Mariners, Laborers, Engineers or Pilots, or through explosions, bursting of boilers, breakage of shafts, or through any latent defect in the machinery or hull, **provided such loss or damage has not resulted from want of due diligence** by the Owners of the Dock, or any of them, or by the Manager, Masters, Mates, Engineers, Pilots or Crew not to be considered as part owners within the meaning of this clause should they hold shares in the Dock.

(Docket No. 130, Exhibit 2)

■ The purpose of an "Inchmaree" clause is to insure against damage or loss occasioned by latent defects in the hull or machinery. *Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 392 (5th Cir.1957) (upholding coverage for a covered perils insurance policy which contained a Inchmaree clause); *Tropical Marine Products v. Birmingham Fire Ins. Co. of Pa.*, 247 F.2d 116, 122 (5th Cir.1957), *cert. denied*, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957). Based on the decisions in *Spot Pack* and *Tropical Marine*, International Ship argues that the policy's "Inchmaree" clause covers any limited warranty of seaworthiness.

In *Tropical Marine*, the court discussed the interaction of the "perils of the sea" and "Inchmaree" clauses in a marine insurance contract. The ship at issue in *Tropical Marine* left Miami in a seaworthy condition and was anchored at Long Key in fifteen (15) feet of water when she began to take on water and later sank. The trial court denied coverage.

Limited to the issue of whether the insurance policy covered the unseaworthiness of the ship after it was at sea, the *Tropical Marine* court reversed, holding, in part, that an Inchmaree clause covered both unseaworthiness not discovered due to the negligence of the owner and unseaworthiness not discovered due to latent defects. *Id.* at 121. In analyzing Inchmaree clauses, the *Tropical Marine* court stated:

[T]he Inchmaree clause is an expansion of coverage of considerable magnitude.... If a vessel has become unseaworthy due to the negligence of master or engineer in the maintenance of the vessel . . ., the cause is negligence and this is expressly underwritten. If there is an undiscoverable defect in hull or machinery, the resulting unseaworthiness or the damage caused by it is nonetheless covered.

*Id.* at 122. Thus, the only limitation on the Inchmaree clause is that the defect in machinery or the hull be latent and one not known or discoverable by the owner or his agent. *Id.* at 119. Of course, a defect in machinery or a defect in a hull means that the ship is unseaworthy under the classic definition of "reasonably fit for the intended use," but it is just this unseaworthiness that Inchmaree clauses are meant to cover.

St. Paul counters International Ship's Inchmaree argument, contending that an Inchmaree clause has no application to the warranty of seaworthiness at the inception of the policy. (Docket No. 138) The Court disagrees. In this case, the warranty of seaworthiness is qualified by the policy's Inchmaree clause, in that, St. Paul insured against loss caused by latent defects in the CHL2's hull or machinery, provided such loss did not result from want of due diligence on the part of International Ship or its agents. *See, e.g., In re Gulf & Midlands Barge Line, Inc.,* 509 F.2d 713, 720 n. 10 (5th Cir.1975) (stating, in dicta, that *Tropical Marine* held that "even unseaworthiness was covered by an Inchmaree clause"); *Tropical Marine,* 247 F.2d at 123 ("[A] . . . policy . . . with an Inchmaree clause does in fact underwrite unseaworthiness of many types"). However, a defect of seaworthiness which is permitted to continue from bad faith or from a lack of due diligence on the part of the insured or his agents, discharges the insurer from liability for any loss which is the consequence of such bad faith or want of ordinary prudence or diligence. *See Spot Pack,* 242 F.2d at 392, n. 3.

 Accordingly, International Ship carries the burden under the policy's Inchmaree clause to show that it complied with its obligation of "due diligence." On the other hand, St. Paul may offer evidence that there was no want of due diligence on the part of International Ship or its agents either before or after the CHL2 set sail from Maine. In this case, whether the defect was latent and due diligence was exercised must be determined from the facts and circumstances of each case. *See Aguirre v. Citizens Casualty Co. of New York,* 441 F.2d 141, 144 (5th Cir.) (determining seaworthiness of vessel at particular moment in time is responsibility of trier of fact), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). Thus, the questions of latent defects and exercise of due diligence remain genuine issues of material fact, which have not been eliminated by International Ship.

### International Ship's "Held Covered" Argument

International Ship's final argument rests on the policy's "held covered" clause which allegedly insures against any breach of warranty in the policy. The clause of the policy at issue states:

HELD COVERED in case of **any breach of warranty** or deviation from the conditions **of this policy,** any additional premium required by agreed immediately after receipt of advices of breach or proposed breach or proposed breach by Owners. Seaworthiness admitted as between the assured and assurers.

(Docket No. 130, Exhibit 2)

 A held covered clause "is intended to protect the assured from a particular hazard, namely, that, despite his best efforts to the contrary, he or his crew failed to comply with the terms of a warranty." *Campbell v. Hartford Fire Ins. Co.,* 533 F.2d 496, 497–98, n. 1 (9th Cir.1976) (citing Long, "Held–Covered" Clauses in Marine Insurance Policies, 24 Ins. Council J. 401, 404–06 (1957)). The effect of the held covered clause is that the vessel remains covered even if the insured breaches one of the warranties specified in the clause. *See Seas Shipping Co. v. United States War Shipping Administration,* 97 F.Supp. 129, 130 (S.D.N.Y.1951) ("the held covered clause in a marine insurance policy means that the vessel will be insured under the policy in the

event of a breach of warranty as to trade or other matters, provided notice be given to the underwriters of such breach and an additional premium paid ...”). *See also Hilton Oil Transp. v. T.E. Jonas,* 75 F.3d 627, 629 (11th Cir.1996) (“By including the [held covered] clause, the insurer accepts the greater risk occasioned by a possible failure to comply with those warranties, **on condition that the breach is not willful,** the assured gives prompt notice in the event a breach occurs and agrees to pay an additional premium”) (quoting Judge, now Mr. Justice Kennedy in *Campbell,* 533 F.2d at 496). Thus, a held covered clause is conditional; the breach of warranty which is covered must not be “willful.” *Campbell,* 533 F.2d at 497–498.

 Again, it is apparent that there is a genuine issue of material fact that must be determined by a trial. If it is found that International Ship did not willfully breach the limited warranty of seaworthiness, the held covered clause will apply and International Ship will prevail. If, however, International Ship willfully breached the limited warranty of seaworthiness, St. Paul will prevail.

## Conclusion

International Ship has failed to establish that there is no genuine issues of material fact within all three (3) of its arguments: (1) the “all risk” argument; (2) the “Inchmaree” argument; and (3) the “held covered” argument. Simply declaring that the CHL2 was unseaworthy at the inception of the policy does not satisfy International Ship’s burden as the moving party. This Court finds that there remains genuine issues of material fact and that International Ship is not entitled to judgment as a matter of law. Accordingly, St. Paul remains entitled to attempt to prove that the policy was void *ab initio* due to the CHL2’s unseaworthiness.

## MOTION TO AMEND COMPLAINT TO STATE CLAIMS FOR PUNITIVE DAMAGES

 International Ship also moves to amend its complaint to state claims for punitive damages against St. Paul. In support of its motion, International Ship has proffered

record evidence, consisting of correspondence, depositions, notices of insurer violations, and factual allegations support by affidavits from William Russell, vice president of International Ship, and Michael Barranco, an insurance expert. (Docket No. 130) However, St. Paul contends that International Ship has failed to produce “record evidence” to support its claim for punitive damages. (Docket No. 147)

 This Court’s authority to permit amendment to a complaint is found in Rule 15(a), Fed.R.Civ.P., which provides that amendment “shall be freely given when justice so requires.” The court can consider may factors in exercising its discretion to permit a party to amend its complaint. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). *See Domke v. McNeil–P.P.C., Inc.,* 939 F.Supp. 849, 851 (M.D.Fla.1996); *Mahon v. City of Largo, Fla.,* 829 F.Supp. 377, 385 (M.D.Fla.1993); *Marcus v. Carrasquillo,* 782 F.Supp. 593, 600 (M.D.Fla.1992). These factors include, but are not limited to undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment. *Foman,* 371 U.S. at 182, 83 S.Ct. at 230, 9 L.Ed.2d at 222. *See Domke,* 939 F.Supp. at 851; *Mahon,* 829 F.Supp. at 385. Accordingly, if the facts and circumstances relied upon by a plaintiff are a proper subject of relief, Rule 15(a)’s mandate to freely permit a party to amend is to be “heeded.” *Foman,* 371 U.S. at 182, 83 S.Ct. at 230, 9 L.Ed.2d at 222.

In the instant case, International Ship has moved to amend its complaint to state claims for punitive damages pursuant to Section 768.72, Fla.Stat. (1995) and Rule 15(a), Fed. R.Civ.P. Section 768.72 provides, in part, that:

> In any civil action, no claim for punitive damages shall be permitted unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages. The claimant may

move to amend his complaint to assert a claim for punitive damages as allowed by the rules of civil procedure.

*See Fletcher v. State of Fla.,* 858 F.Supp. 169, 173 (M.D.1994) (applying Section 768.72); *Lewis v. Snap–On Tools Corp.,* 708 F.Supp. 1260, 1262 (M.D.Fla.1989) (applying Section 768.72).

Neither International Ship nor St. Paul dispute that Section 768.72 is substantive and must be applied by federal courts. Moreover, this Court has on a number of occasions found Section 768.72 to be "substantive" and, thus, has applied Section 768.72 in federal court claims under the Erie Doctrine. *See Mahon,* 829 F.Supp. at 385; *Marcus,* 782 F.Supp. at 600 ("Since the State legislature passed Section 768.72, and the State courts have applied it, it is evident that both the legislature and judicial branches of Florida's government consider this to be substantive law"); *Lancer Arabians, Inc. v. Beech Aircraft Corp.,* 723 F.Supp. 1444, 1446 (M.D.Fla. 1989) ("Section 768.72 ... is clearly substantive because it sets the standard for establishing a claim for punitive damages. Any procedural provisions of these sections are intimately related to the definition of those substantive rights"). *But see State of Wis. Inv. Bd. v. Plantation Square Assoc., Ltd.,* 761 F.Supp. 1569, 1573–76 (S.D.Fla.1991) (finding that Section 768.72 clashed with Rule 8, Fed.R.Civ.P.), and *Hanna v. Plumer,* 380 U.S. 460, 470, 85 S.Ct. 1136, 1143, 14 L.Ed.2d 8, 16 (1965) (stating that the preliminary inquiry for a district court is whether the state provision directly conflicts with a Federal Rule of Civil Procedure), and thus declined to apply the pleading aspects of Section 768.72 because the failure to do so would lead to neither an inequitable administration of the laws nor to forum-shopping); *Jones v. Wal–Mart Stores, Inc.,* 1991 WL 236503, at *2 (S.D.Fla. Apr. 25, 1991) (holding that "inasmuch as Section 768.72 is a pleading statute, it is inapplicable to Florida state law claims being litigated in federal court"); *Citron v. Armstrong World Indust., Inc.,* 721 F.Supp. 1259, 1261 (S.D.Fla.1989) (holding Section 768.72 to be procedural, not substantive).

On June 7, 1996, International Ship filed its proffer in support of its claim for punitive damages. (Docket No. 130) International Ship contends that St. Paul wrongfully denied its claims and wrongfully voided its insurance coverage for the purpose of forcing an unfair settlement and to charge a higher premium. (Docket Nos. 130, 137)

In Florida, punitive damages are appropriate when a defendant's conduct is fraudulent, deliberately violent or oppressive, malicious, or committed with such gross negligence as to indicate a wanton disregard for the rights of others. *Cook v. Deltona Corp.,* 753 F.2d 1552, 1563 (11th Cir.1985) ("Under Florida law, punitive damages are available only upon a showing that the act complained of is characterized by willfulness, wantonness, maliciousness, gross negligence or recklessness, oppression, outrageous conduct, deliberate violence, moral turpitude, insult, or fraud"). *See W.R. Grace & Co.—Conn. v. Waters,* 638 So.2d 502, 503 (Fla.1994); *White Constr. Co. v. Dupont,* 455 So.2d 1026, 1028–29 (Fla.1984). "Whether punitive damage liability arises as a consequence of a tort or a coincidentally tortious breach of contract duty, the issue is the same, an assertion of a duty breached." *Cook,* 753 F.2d at 1563. Moreover, the availability of punitive damages turns upon the moral turpitude, or lack thereof, involved in that breach. *See id.* The requisite evil intent may also be inferred from the defendant's having pursued a course of action in wanton disregard of the consequences. *Johns–Manville Sales Corp. v. Janssens,* 463 So.2d 242, 247 (Fla. 1st DCA 1984).

In the instant case, International Ship seeks punitive damages against St. Paul based on Section 624.155, Fla.Stat. (1995), which states:

No punitive damages shall be awarded under this section unless the acts giving rise to the violation occur with such frequency as to indicate a general business practice and these acts are: (a) willful, wanton, and malicious; (b) in reckless disregard for the rights of any insureds; or (c) in reckless disregard for the rights of a beneficiary under a life insurance contract.

International Ship contends that it has met both prongs of Section 624.155 by establishing through record evidence: (1) that St. Paul acted willfully, wantonly, and maliciously or in reckless disregard for International Ship's rights, and (2) that St. Paul's acts reflect a general business practice. (Docket No. 130)

In support of this contention, International Ship argues that St. Paul has violated Florida's Unfair Insurance Trade Practices Act, Fla.Stat. § 626.9541 et seq. (1995), and Florida's Bad Faith Statute, Fla.Stat. § 624.155 et seq. (1995). (Docket No. 130) International Ship also argues that St. Paul will not be prejudiced by this amendment nor will there be any delays to the action. This is because the Court has recently abolished all deadlines and has taken this case off the trial docket. (Docket No. 137) Based on these arguments coupled with the affidavits, depositions, notices of insurer violations, and correspondence submitted, International Ship states that it has proffered adequate evidence of outrageous, willful, wanton, and malicious conduct on the part of St. Paul to support its claim for punitive damages. (Docket No. 137)

In contrast, St. Paul argues that the only record evidence submitted by International Ship's proffer are the spurious affidavit of William Russell and the conclusory affidavit of Michael Barranco. St. Paul refutes International Ship's allegations that: (1) St. Paul acted in bad faith when it refused to pay for the drydocking of the CHL2; (2) the cause of the CHL2's casualty between Maine and Boston was due to the CHL2 striking a submerged object; (3) St. Paul improperly denied International Ship's claim under the policy; and (4) St. Paul acted in an improper manner when it offered International Ship "conditional" new coverage. (Docket No. 147) To a great extent, St. Paul's argument is based purely on a "factual debate" between the parties and their experts and witnesses. Nothing provided by St. Paul, on a legal position, prevents this Court from allowing International Ship leave to amend its complaint.

Under Florida law, the plain meaning of Section 768.72 requires only that the plaintiff provide the court with a "reasonable evidentiary basis for punitive damages before the court may allow a claim for punitive damages to be included in a plaintiff's complaint." *Globe Newspaper Co. v. King*, 658 So.2d 518, 520 (Fla.1995). The Court finds that International Ship has met this burden.

Despite St. Paul's factual debate presented in its memorandum of law in opposition, International Ship has proffered record evidence which establishes a "reasonable showing" for a "reasonable basis" for recovery of punitive damages as required by Section 768.72. By adding a claim for punitive damages, International Ship does not "prejudice" St. Paul, nor does it "unduly delay" this action. Additionally, this Court does not find any dilatory motive by International Ship in filing this motion. Accordingly it is

**ORDERED** that International Ship's motion for partial summary judgment on St. Paul's affirmative defenses (Docket No. 132) be **DENIED**; that International Ship's motion to amend complaint to state claims for punitive damages (Docket No. 137) be **GRANTED**; and International Ship **shall have** ten (10) days to file its amended complaint.

**DONE and ORDERED.**